1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **CENTRAL DISTRICT OF CALIFORNIA**

10

11  SANDRA NIMMO,                        )   NO. EDCV 09-01404 SS
                                         )
12               Plaintiff,              )
                                         )
13         v.                            )   **MEMORANDUM DECISION AND ORDER**
                                         )
14  MICHAEL J. ASTRUE,                   )
    Commissioner of the Social           )
15  Security Administration,             )
                                         )
16               Defendant.              )
    ─────────────────────────────────────)
17

18                                  **I.**

19                             **INTRODUCTION**

20

21       Plaintiff Sandra Nimmo ("Plaintiff") brings this action seeking to

22  reverse the decision of the Commissioner of the Social Security

23  Administration (the "Commissioner" or the "Agency") denying her

24  application for Supplemental Security Income ("SSI").  The parties

25  consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the

26  undersigned United States Magistrate Judge.  For the reasons stated

27  below, the decision of the Commissioner is AFFIRMED.

28

## II.

### PROCEDURAL HISTORY

On August 28, 2003, Plaintiff filed a prior application for Disability Insurance Benefits ("DIB") claiming that she became disabled on April 1, 1983. (Administrative Record ("AR") 29-31). The Agency denied her application and she submitted a request for reconsideration, which was also denied. (AR 39). Plaintiff then requested a hearing, which was held before Administrative Law Judge ("ALJ") Lauren Mathon on February 1, 2005. (AR 39, 376-405). Plaintiff appeared with counsel and testified. (AR 378, 381-84, 389-400). On April 27, 2005, the ALJ issued a decision denying benefits. (AR 39-46). Plaintiff did not appeal this decision to the district court. Accordingly, the April 27, 2005 agency decision became the final decision of the agency pertaining to the time period from 1983 through the date of the decision, April 27, 2005.

On July 25, 2005, Plaintiff filed a second application for SSI benefits claiming that she became disabled on April 28, 2005. (AR 74-76). The Agency denied her application and she submitted a request for reconsideration on September 27, 2005. (AR 66). The Agency denied her application again on January 19, 2006. (AR 59-63). Plaintiff then requested a hearing, which was held before Administrative Law Judge Thomas J. Gaye on October 11, 2007. (AR 58, 355-75). Plaintiff appeared with counsel and testified. (AR 358-61, 363-73). On December 12, 2007, the ALJ issued a decision denying benefits. (AR 13-21). Plaintiff sought review before the Appeals Council, which denied the request on June 10, 2009. (AR 4-9). On July 24, 2009, Plaintiff filed

1  the instant action.  Pursuant to the Court's Case Management Order, the
2  parties filed a Joint Stipulation ("Jt. Stip.") on February 2, 2010.

3

4                                    **III.**

5                          **FACTUAL BACKGROUND**

6

7       Plaintiff was born on April 13, 1964 and was forty-three years old
8  at the time of the hearing.  (AR 74, 363).  Plaintiff dropped out of
9  school after the ninth grade.  (AR 363-64).  Plaintiff is single and
10 lives with her two sons, ages fifteen and twenty-two.  (AR 74, 364-65).
11 Plaintiff has not worked in the last fifteen years.  (AR 365).

12

13 **A.   Plaintiff's Medical History**

14

15      The medical records show that Plaintiff sought treatment from the
16 Community Hospital of San Bernardino from July 25, 1998 to January 21,
17 2001.  (AR 111-28).  On July 25, 1998, Plaintiff was treated by Dr.
18 Miguel Rodriguez, M.D. ("Dr. Rodriguez") for a broken toe.  (AR 125-28).
19 On January 1, 2001, Plaintiff was treated by Dr. J.A. Ibanez, M.D. ("Dr.
20 Ibanez") for vaginal bleeding.  (AR 114, 118-19).  On January 21, 2001,
21 Plaintiff was treated for itchy red blotches all over her body.  (AR
22 112).  On June 20, 2000, Plaintiff was treated for a possible broken
23 finger.  (AR 120-24).

24

25      Plaintiff sought treatment from the St. Bernardine Medical Center
26 from November 12, 1998 to November 19, 2003.  (AR 129-40).  On November
27 12, 1998, Dr. Michael G. Nespole, M.D. ("Dr. Nespole") gave Plaintiff
28 a mammogram.  (AR 133).  On June 16, 1999, Dr. Eugene I. Emembolu, M.D.

3

("Dr. Emembolu") diagnosed Plaintiff with mild degenerative changes of the lumbar spine and mild desiccation of the L4-5 disc.  (AR 134-35). On September 25, 2000, Dr. Joel H. Block, M.D. ("Dr. Block") gave Plaintiff a mammogram.  (AR 136).  On October 11, 2002, Dr. Nespole gave Plaintiff a mammogram.  (AR 137-38).  On November 19, 2002, Dr. Nespole performed an ultrasound of Plaintiff's right breast.  (AR 139).  On February 17, 2003, Dr. Ronald Boyd, M.D. ("Dr. Boyd") performed an ultrasound of Plaintiff's gallbladder.  (AR 140).  In mid November of 2003, Plaintiff was treated by Dr. K. Balasubramaniam, M.D. ("Dr. Balasubramaniam") for rectal bleeding.  (AR 130-32).

Plaintiff sought treatment from Dr. Samuel N. Cherny, M.D., ("Dr. Cherny") from March 29, 1995 to March 28, 2005.  (AR 141-260).  During this time period, Dr. Cherny treated Plaintiff approximately monthly for a wide range of complaints including depression, stomach pain, the flu, leg pain, body aches, pink eye, lice, sore throat, and knee pain. (See, e.g., AR 142-43, 145-50, 153-57, 159-60, 162-63, 166-68, 171-72, 175-77, 179-84, 193, 195-96, 201-02).

Plaintiff sought treatment from Dr. J. Robert Evans, M.D. ("Dr. Evans") from April 25, 2005 to November 5, 2005.  (AR 261-65).  On April 25, 2005, Dr. Evans treated Plaintiff for symptoms including blood and discharge in her stool.  (AR 265).  On August 31, 2005, October 4, 2005, and November 5, 2005, Dr. Evans treated Plaintiff for proctitis.  (AR 262-64).

Plaintiff sought treatment from the San Bernardino County Department of Behavioral Health from May 20, 2002 to December 8, 2005.

4

(AR 274-309).   On May 20, 2002, Dr. Patricia J. Prendergast, Ph.D., M.F.T. ("Dr. Prendergast") diagnosed Plaintiff with major depressive disorder.   (AR 284-92).   From June 4, 2004 to July 7, 2005, Plaintiff sought treatment repeatedly from Dr. Robert Cabugao, M.D. ("Dr. Cabugao") for problems with her mood.   (AR 279-83, 297-300, 302-09). During this time period, Dr. Cabugao prescribed Wellbutrin, Effexor, and Seroquel for Plaintiff.   (AR 281-83, 294-96).   On October 11, 2005, November 8, 2005 and December 8, 2005, Plaintiff sought treatment from Dr. Jesse De Vera, M.D. ("Dr. De Vera") for problems with her mood.   (AR 275-77).

**B.   State Agency Physicians**

Dr. A. Lizarraras, M.D. ("Dr. Lizarraras") reviewed Plaintiff's medical records as well as the ALJ's April 27, 2005 finding of nondisability to determine whether Plaintiff could show materially changed circumstances. (AR 310-11).   On August 15, 2005, Dr. Lizarraras concluded that Plaintiff had failed to show materially changed circumstances and adopted the ALJ's finding of nondisability. (AR 311).

Dr. Michael Skopec, M.D. ("Dr. Skopec") also reviewed Plaintiff's medical records and the ALJ's April 27, 2005 finding of nondisability to determine whether Plaintiff could show materially changed circumstances. (AR 312-27).   On September 8, 2005, Dr. Skopec issued a functional capacity assessment that concluded Petitioner could "sustain simple repetitive tasks with adequate pace and persistence" and could "adapt and relate to coworkers and [supervisors]," but could not "work with [the] public."   (AR 326).   Dr. Skopec further concluded that

5

Plaintiff had failed to show materially changed circumstances and adopted the ALJ's finding of nondisability. (Id.). Dr. Skopec found that Plaintiff had the medically determinable impairment of depression. (AR 315). Based on this impairment, Dr. Skopec found that Plaintiff had mild limitations in daily living activities, mild limitations in maintaining social functioning, mild limitations in maintaining concentration, persistence, or pace, and has had one or two episodes of decompensation. (AR 322). Dr. Skopec further concluded that Plaintiff had moderate limitations in the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or proximity to others without being distracted by them, and the ability to interact appropriately with the general public. (AR 324-25).

Clinical psychologist, Dr. David Glassmire ("Dr. Glassmire"), testified at the October 11, 2007 hearing that he had reviewed Plaintiff's medical records and concluded that Plaintiff was not disabled. (AR 359-61). Dr. Glassmire diagnosed Plaintiff with major depressive disorder, recurrent, moderate and opined that Plaintiff was limited to habituated type tasks or repetitive type tasks. (AR 360). Dr. Glassmire explained that these tasks did not necessarily have to be simple, but that Plaintiff should do "the same types of things over and over." (Id.). Dr. Glassmire further explained that Plaintiff was limited from engaging in tasks "requiring hypervigilance, no fast paced

work, and only accusal non-intense contact with the public, co-workers or supervisors." (Id.).

## C.   **Plaintiff's Testimony**

Plaintiff testified at the October 11, 2007 hearing that she suffers from depression, anxiety, and colitis. (AR 359). Plaintiff explained that her colitis is characterized by rectal bleeding and mucus whenever she is subject to "any type of stress" or if she gets "upset." (Id.). Plaintiff testified that she has trouble focusing, retaining information, and concentrating. (AR 364). Plaintiff testified that "most days it's hard to even get out of bed . . . let alone take a shower." (AR 365). Plaintiff explained that there are days that she does not get dressed or shower because she does not have the "energy" or "will." (AR 367). Plaintiff further explained that "sometimes four days will go by where "she does not bathe because she "just want[s] to hide away in [her] room." (Id.).

Plaintiff further testified that she suffers from "really bad mood swings" and has difficulty controlling her temper to the point that she gets in physical altercations with people for little or no reason. (AR 366). Plaintiff explained that she is "[e]xtremely sensitive," "easily aggravated," (AR 366), cries for no reason, and suffers from "easy irritability." (AR 367).

Plaintiff further testified about her daily living activities. (AR 369-73). Plaintiff explained that she drives her son to school and otherwise leaves the house to go buy groceries and household products.

(AR 369-70).  Plaintiff testified that she does not cook meals and instead mostly snacks throughout the day.  (AR 373).  Plaintiff testified that she and her older son do the laundry and that she sometimes dusts and picks up around the house.  (Id.).

On Plaintiff's Function Report, dated August 26, 2005, she also described her daily living activities.  (AR 95-102).  Plaintiff wrote that she "take[s] care of [her] 2 sons" and "take[s] them wherever they need to go."  (AR 96).  Plaintiff explained that she leaves the house "[a] couple of times a week."  (AR 98).  Plaintiff further wrote that she "wash[es] clothes" and "cook[s] sometimes."  (AR 96).  Plaintiff indicated that she washes her family's clothes, hangs them up, and sometimes dusts.  (AR 97).  Plaintiff explained that she cleans once every week or two and that her cleaning activities can take her up to an hour on one room.  (Id.).  Plaintiff wrote that she spends most of her time at home on the internet communicating with her friends.  (AR 99).  Plaintiff explained that she uses the computer daily and uses the phone maybe once per day.  (Id.).  Finally, Plaintiff wrote that she can sometimes walk short distances and other times long distances before needing to rest.  (AR 100).

**D.  Vocational Expert's Testimony**

Sandra Moore Fioretti testified at the October 11, 2007 hearing as a vocational expert ("VE").  (AR 361).  After the VE heard Dr. Glassmire's testimony about Plaintiff's limitations, the VE testified that there was entry level work available.  (AR 362).  The ALJ then posed the following hypothetical to the VE:

8

Now I'm going to give you different series of limitations. These are from the Agency, 8F, Counsel, all moderate, six of them, B5, B6, B7, B8, B9, and C12.  Take a moment to digest those, and moderate as usual is defined as something which is significant and impairs the ability but does not preclude function in each of tehse areas.  Where do you think there would be work with those six moderate limitations or not?

(Id.).  Based on these hypothetical limitations, the VE testified that there would be available work.  (Id.).

Plaintiff's counsel then questioned the VE and asked the VE to redefine moderate from the ALJ's hypothetical to mean "50% loss of capability in those areas."  (AR 362).  Plaintiff's counsel then clarified that he was defining moderate as a "total loss," "[h]alf the time."  (Id.).  Based on these adjustments to the ALJ's hypothetical, the VE testified that there would not be any work available.  (Id.).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing

---

[1]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. § 416.910.

42 U.S.C. § 423(d)(1)(A)).   The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.   Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.   20 C.F.R. § 416.920.   The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity?   If so, the claimant is found not disabled. If not, proceed to step two.

(2)   Is the claimant's impairment severe?   If not, the claimant is found not disabled.   If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1?   If so, the claimant is found disabled.   If not, proceed to step four.

(4)   Is the claimant capable of performing his past work?   If so, the claimant is found not disabled.   If not, proceed to step five.

(5)   Is the claimant able to do any other work?   If not, the claimant is found disabled.   If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. § 416.920(b)-(g)(1).

10

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. <u>Bustamante</u>, 262 F.3d at 953-54. If, at step four, the claimant meets his burden of establishing an inability to perform the past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"),[2] age, education and work experience. <u>Tackett</u>, 180 F.3d at 1100; 20 C.F.R. § 416.920(g)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000).

## V.

## THE ALJ'S DECISION

The ALJ employed the five-step sequential evaluation process. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since July 1, 2005. (AR 16). At step two, the ALJ found that Plaintiff had the severe impairments of "depression, anxiety, [and] history of proctitis." (<u>Id.</u>). The ALJ further concluded that Plaintiff's severe impairments "cause more than minimal functional

---

[2]     Residual functional capacity is "the most [one] can still do despite [his] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. § 416.945(a).

11

restrictions in claimant's ability to perform the basic requirements of work."  (Id.).

At step three, the ALJ found that Plaintiff's impairments, either singly or in combination, do not meet or equal the requirements of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 16).  At step four, the ALJ determined that Plaintiff retained a physical RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: moderate restrictions in carrying out detailed instructions, in maintaining attention and concentra[ti]on for extended periods, in performing activities within a schedule and maintaining regular attention and punctuality, in sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, and in interacting appropriately with the general public."  (AR 16-17).

At step five, the ALJ found that based on Plaintiff's age, educational background, work experience, RFC and the vocational expert's testimony, "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (AR 20).  Specifically, The ALJ found that Plaintiff could perform the jobs of hand packager, kitchen helper, and cleaner.  (Id.).  Accordingly, the ALJ found that Plaintiff was not disabled.  (Id.).

\\
\\
\\

12

## VI.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance."  Reddick, 157 F.3d at 720.  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion."  Id.  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'"  Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner.  Reddick, 157 F.3d at 720-21.

## VII.

## DISCUSSION

Plaintiff contends that the ALJ erred for four reasons.  First, Plaintiff argues that the ALJ rejected evidence from treating physician Dr. De Vera without providing sufficient justification.  (Jt. Stip. at

13

3-4).   Second,  Plaintiff  argues  that  the  ALJ  rejected  evidence  from treating  psychologist  Dr.  Prendergast  without  providing  sufficient justification.   (Id. at 8-9).   Third,  Plaintiff  argues  that  the  ALJ failed to properly consider the severity of her mental impairment.  (Id. at 11-12).   Fourth,  Plaintiff  argues  that  the  ALJ  failed  to  properly consider  her  functional  limitations  when  determining  that  she  could perform work as a hand packager, kitchen helper, and cleaner.  (Id. at 13-15).  For the reasons discussed below, the Court disagrees with all of Plaintiff's contentions.

**A.**   **The  Prior  Finding  Of  Plaintiff's  Nondisability  Creates  A Presumption Of Nondisability Which Plaintiff Did Not Rebut With A Showing Of Changed Circumstances**

Prior  to  the  current  SSI  application,  Plaintiff  filed  an application for DIB on the same basic impairments alleged here.  (AR 39-40).   The  ALJ  found  that  Plaintiff  was  not  disabled  on  her  prior application.  (AR 39-46).  When a claimant reapplies for benefits, a prior  finding  of  nondisability  creates  a  presumption  of  continuing nondisability.  See Vasquez v. Astrue, 572 F.3d 586, 597 (9th Cir. 2009) ("Normally, an ALJ's findings that a claimant is not disabled creates a presumption that the claimant continued to be able to work after that date." (internal quotation marks omitted)); accord Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1995).  In order to overcome this presumption, Plaintiff must show that circumstances have changed since her prior denial.   Lester, 81 F.3d at 827 ("The presumption does not apply, however, if there are changed circumstances." (internal quotation marks omitted)).

14

Here, the ALJ expressly relied on the prior finding of nondisability and concluded that Plaintiff had failed to overcome the presumption. (AR 13-14, 19). The ALJ incorporated by reference the medical evidence from the prior decision and specifically addressed Plaintiff's subsequent medical treatment. (AR 18-19). First, the ALJ noted that Plaintiff had been treated by Dr. Evans for proctitis since the last decision. (AR 18). However, the ALJ pointed out that according to Dr. Evans, Plaintiff's symptoms had improved with medication. (Id.; see also AR 265).

Second, the ALJ noted that Plaintiff had continued to be treated for depression since the last decision. (AR 18). However, the ALJ pointed out that a June 2, 2005 clinic note "indicated that [Plaintiff's] anxiety was under control." (Id.; see also AR 298). The ALJ further noted that Plaintiff's "mood in July, 2005 was stable," she had "been compliant with her medications[,] and these were increased." (AR 18; see also AR 297). Additionally, the ALJ observed that Dr. De Vera's medication visit notes since October 2005 were consistent with the prior medical evidence and that Dr. De Vera's December 8, 2005 clinic notes indicated that Plaintiff was "alert and oriented x 3 with no hallucinations, suicidal ideation and that she was neurologically intact." (AR 18; see also AR 275-77).

Third, the ALJ noted that the state agency physicians "concluded in September, 2005 that [Plaintiff] had . . . moderate restrictions . . . and adopted the previous ALJ decision." (AR 18; see also AR 311, 326).

Fourth, the ALJ noted that Plaintiff's medications "were renewed from January 19, 2006 through July 19, 2007." (AR 18). However, the ALJ pointed out that Dr. De Vera's January 11, 2007 and March 3, 2007 notes "again show[ed] that [Plaintiff] was alert, oriented x 3, [and] that she reported no hallucinations or suicidal ideation." (AR 18; see also 334-35). The ALJ further pointed out that on May 3, 2007, June 7, 2007, and July 19, 2007, Dr. De Vera noted that Plaintiff "continue[d] to experience depression," but "offered no opinion as to [Plaintiff's] functional abilities, [or] prognosis." (AR 19; see also 331-33).

Fifth, the ALJ noted that Dr. Glassmire "testified that [Plaintiff] could perform repetitive tasks but no work requiring hypervigilance or fast pace" and "could have occasional nonintense contact with workers, supervisors and the public." (AR 19; see also AR 360-61). The ALJ further pointed out that Dr. Glassmire "disagreed with a treating doctor's report of disability." (AR 19; see also AR 360-61).

Sixth, the ALJ noted that Plaintiff's sons are older than when she previously applied for benefits (now 15 and 22), "yet [Plaintiff] continues to perform household chores, laundry, shopping, occasional cooking, apparently driving and other care for herself and her sons." (AR 19; see also AR 96-98). The ALJ further noted that "[a]lthough [Plaintiff] alleges severe weakness and fatigue from recurrent bouts of painful diarrhea[,] there [was] no evidence that she ha[d] been treated for this longstanding condition since November, 2005." (AR 19). Finally, the ALJ concluded that "[t]he extent of [Plaintiff's] activities [wa]s not consistent with the degree of functional restriction [she] allege[d] from this impairment." (Id.).

16

In sum, the Court concludes that Plaintiff failed to show changed circumstances sufficient to overcome the presumption of nondisability. Thus, the ALJ appropriately relied on the prior finding of nondisability. (AR 19).

**B.**  **Plaintiff's Claim That The ALJ Rejected The Treating Physician's Opinion Does Not Warrant Remand**

Plaintiff's first claim is that the ALJ rejected evidence from treating physician Dr. De Vera without providing sufficient justification. (Jt. Stip. at 3-4). Specifically, Plaintiff argues that the ALJ rejected Dr. De Vera's August 19, 2008 mental capacities questionnaire. (Id.; see also AR 353). The Court disagrees.

In an August 19, 2008, mental capacities questionnaire, Dr. De Vera made the following observations:

> Due to her mental disorder, the patient has mood swings, difficulty concentrating and she is easily distracted, she has some . . . episodes of paranoia and extreme sensitivity.

> Patient has difficulty communicating [with] members of the public . . . which can lead to a lot of misunderstanding and conflicts.

> Patient does not have the patience needed to focus on tasks for certain period of time due to her mental illness.

17

. . .

Patient is not capable of functioning under the stress of employment due to her mental illness.

(AR 353).

Plaintiff argues that "all of the [P]laintiff's above-referenced mental limitations, including mood swings, difficulties concentrating and communicating, inability to focus on tasks and function under work related stress, clearly have significant vocational ramifications, but the ALJ ignored this relevant treating source opinion without explanation which is impermissible." (Jt. Stip. at 3). As an initial matter, the Court notes that Dr. De Vera did not complete the above-referenced questionnaire until August 19, 2008 and therefore the ALJ cannot be faulted for failing to have considered it in his December 12, 2007 opinion. See Mills v. Apfel, 244 F.3d 1, 4 (1st Cir. 2001) ("The ALJ can hardly be expected to evaluate or account for the evidence that he never saw."). Nonetheless, the Court considers Dr. De Vera's questionnaire because it was considered by the Appeals Council, which denied review on June 10, 2009. (AR 4-9); see Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir. 1993) ("[W]e consider on appeal both the ALJ's decision and the additional material submitted to the Appeals Council.").

This Court may remand a matter to the Commissioner if there is new evidence which is "material" to a determination of disability and Plaintiff shows good cause for having failed to produce that evidence

18

earlier.  See 42 U.S.C. § 405(g) (2001).  To justify a remand, Plaintiff "must additionally demonstrate that there is a reasonable probability that the new evidence would have changed the outcome of the administrative hearing."  Mayes v. Massanari, 276 F.3d 453, 462 (9th Cir. 2001) (internal quotation marks omitted).  Here, however, Plaintiff cannot demonstrate a reasonable probability that Dr. De Vera's questionnaire would have changed the ALJ's decision because Dr. De Vera's observations are entirely consistent with the ALJ's RFC determination.  Indeed, the ALJ incorporated into the RFC determination "moderate restrictions in carrying out detailed instructions, in maintaining attention and concentra[ti]on for extended periods, in performing activities within a schedule and maintaining regular attention and punctuality, in sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, and in interacting appropriately with the general public."  (AR 17).

Moreover, Dr. De Vera's questionnaire provided only conclusory observations without any supporting clinical findings.  (AR 353).  See Batson v. Comm'r of the SSA, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings." (citation omitted)); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) ("When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings.").  Indeed, Dr. De Vera's observation that Plaintiff "is not capable of functioning under the stress of employment due to her mental illness" constitutes

an opinion on the ultimate issue of Plaintiff's disability which would not have been binding on the ALJ.  (AR 353); see Batson, 359 F.3d at 1194-95 ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." (internal quotation marks omitted)).

In sum, remand is not appropriate because Plaintiff cannot show a reasonable probability that Dr. De Vera's questionnaire would have overcome the presumption of nondisability.  The Court also notes that remand is not necessary because Plaintiff has not shown good cause for having failed to produce this evidence earlier.

**C.   Plaintiff's   Claim   That   The   ALJ   Rejected   The   Treating Psychologist's Opinion Does Not Warrant Remand**

Plaintiff's second claim is that the ALJ rejected evidence from treating psychologist Dr. Prendergast without providing sufficient justification. (Jt. Stip. at 8-9). Specifically, Plaintiff argues that the ALJ rejected Dr. Prendergast's May 20, 2002 diagnosis report. (Id.; see also AR 284.).  The Court disagrees.

In a May 20, 2002 diagnosis report, Dr. Prendergast diagnosed Plaintiff with major depressive disorder, recurrent, moderate severity and assessed Plaintiff with a global assessment of functioning ("GAF") score of 45.  (AR 284).  Plaintiff argues that "the ALJ ignored this opinion without explanation, which is impermissible." (Jt. Stip. at 8). As an initial matter, the Court notes that Dr. Prendergast's May 20,

20

2002 diagnosis report relates to the prior period of nondisability and thus is not relevant to showing changed circumstances. See Vasquez, 572 F.3d at 597 ("Normally, an ALJ's findings that a claimant is not disabled creates a presumption that the claimant continued to be able to work after that date." (internal quotation marks omitted)).

Moreover, Dr. Prendergast's diagnosis report is entirely consistent with the ALJ's findings. Indeed, the ALJ found at step two that Plaintiff had the severe impairments of depression and anxiety. (AR 16). Further, the ALJ incorporated into the RFC determination "moderate restrictions in carrying out detailed instructions, in maintaining attention and concentra[ti]on for extended periods, in performing activities within a schedule and maintaining regular attention and punctuality, in sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, and in interacting appropriately with the general public." (AR 17).

Plaintiff argues that "Plaintiff's GAF score of 45 is indicative of a disabling impairment." (Jt. Stip. at 11) (internal quotation marks omitted). However, GAF scores have limited value in social security cases because they are only intended to be used to plan treatment and measure the treatment's impact. See DSMV IV, at 32. Indeed, the Agency has refused to endorse GAF scores for "use in the Social Security and SSI Disability programs," and has explained that GAF scores do "not have a direct correlation to the severity requirements in [the Agency's] mental disorder listings." 65 Fed. Reg. 50746, 50764-65 (August 21, 2000). Additionally, Plaintiff's GAF score was not required for the ALJ

to accurately determine the Plaintiff's RFC.  See Howard v. Comm'r of Social Security, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.  Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate.").

In sum, remand is not appropriate because Dr. Prendergast's diagnosis report relates to the prior period of nondisability and thus is not relevant to showing changed circumstances.  The Court also notes that remand is not necessary because Dr. Prendergast's diagnosis of major depressive disorder was consistent with the ALJ's findings and Dr. Prendergast's assessment of Plaintiff's GAF score has limited value.

**D.   Plaintiff's Claim That The ALJ Improperly Considered The Severity Of Her Mental Impairment Does Not Warrant Remand**

Plaintiff's third claim is that the ALJ failed to properly consider the severity of her mental impairment.  (Jt. Stip. at 11-12). Specifically, Plaintiff argues that the ALJ failed to consider Dr. De Vera's August 19, 2008 mental capacities questionnaire and Dr. Prendergast's May 20, 2002 diagnosis report and therefore "improperly found [Plaintiff's] mental impairment to be non-severe." (Id. at 12). The Court disagrees.

As an initial matter, the ALJ expressly found that Plaintiff had the severe mental impairment of depression.  (AR 16).  Thus, the premise of Plaintiff's claim is contradicted by the record.  Moreover, as set

forth above, see supra Part VII.B. & C., neither Dr. De Vera's questionnaire nor Dr. Prendergast's report are sufficient to overcome the presumption of nondisability. Accordingly, remand is not warranted.

**E.   Plaintiff's Claim That The ALJ Improperly Considered The Severity Of Her Mental Impairment Does Not Warrant Remand**

Plaintiff's fourth claim is that the ALJ failed to properly consider her functional limitations when determining that she could perform work as a hand packager, kitchen helper, and cleaner. (Jt. Stip. at 13-14). Specifically, Plaintiff argues that the jobs of hand packager, kitchen helper, and cleaner require functional abilities beyond Plaintiff's RFC. (Id.). The Court disagrees.

At the October 11, 2007 hearing, the VE testified that a hypothetical claimant with Plaintiff's RFC could perform the jobs of hand packager, kitchen helper, and cleaner. (AR 374). Plaintiff relies on the Dictionary of Occupational Titles (the "DOT") which requires a Reasoning Level 2 for the jobs of hand packager, kitchen helper, and cleaner. (Jt. Stip. at 2; see also id., Exhs. A-C). Reasoning Level 2 requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized instructions." (Id., Exhs. A-C). Plaintiff argues that Reasoning Level 2 is inconsistent with the stated mental limitations in her RFC because Reasoning Level 2 requires the ability "to carry out detailed but uninvolved written or oral instructions," (Jt. Stip., Exhs. A-C), and

23

Plaintiff's RFC incorporates "moderate restrictions in carrying out detailed instructions," (AR 17). (Jt. Stip. at 13).

The Court concludes that Reasoning Level 2 does not exceed Plaintiff's stated mental limitations in her RFC. Indeed, the plain language of Reasoning Level 2 only requires the ability "to carry out detailed <u>but uninvolved</u> written or oral instructions." (Jt. Stip., Exhs. A-C) (emphasis added). Plaintiff ignores the qualifying language that the instructions be "uninvolved." (Jt. Stip. at 13); <u>see also</u> <u>Meissl v. Barnhart</u>, 403 F. Supp. 2d 981, 984 (C.D. Cal. 2005) ("Even more problematic for [the plaintiff's] position is that she ignores the qualifier the DOT places on the term 'detailed' as also being 'uninvolved.'"). Thus, the ability to carry out detailed, <u>but uninvolved</u> instructions is entirely consistent with Plaintiff's moderate restrictions in carrying out detailed instructions. Accordingly, remand is not warranted.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

24

# VIII.

## CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[3] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: March 25, 2010

_____/s_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

---

[3]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."